IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JANICE TANGRADI,

        Plaintiff,

   v.

CITY/COUNTY OF PHILADELPHIA, et al.,

        Defendants.

CIVIL ACTION
NO. 21-2165

## OPINION

**Slomsky, J.**                                                           **March 17, 2022**

## I.  INTRODUCTION

On May 12, 2021, Plaintiff Janice Tangradi initiated this case against multiple Defendants: (1) the City/County of Philadelphia; (2) City Commissioners Lisa M. Deely, Al Schmidt, and Anthony Clark; (3) City Commission employee Jane Doe; (4) Danaher Corporation; (5) Total Control, Inc.; (6) ABC Corporation; (7) Fortive Corporation; and (8) Dynapar Corporation d/b/a Danaher Controls.  (Doc. No. 1.)  Attention here is focused on only three Defendants: (1) the City/County of Philadelphia, (2) City Commissioner Lisa M. Deely, and (3) City Commissioner Al Schmidt (collectively, "Moving Defendants").[1]

---

[1]   Defendants Total Control, Inc. and Danaher Corporation entered into separate stipulations with Plaintiff dismissing them as Defendants.  (Doc. Nos. 27, 32.)  Defendants Dynapar Corporation d/b/a Danaher Controls and Fortive Corporation filed Answers to the Amended Complaint. (Doc. Nos. 14, 15.)  Defendant Commissioner Anthony Clark, who has not yet been served with a summons and the Amended Complaint, and ABC Corporation, which is a fictitious entity that is serving as a placeholder until Plaintiff can ascertain the manufacturer of the product at issue in this case, also remain in this case.  Plaintiff's claims against Defendants ABC Corporation, Fortive Corporation, and Dynapar Corporation d/b/a Danaher Controls are for negligence and strict liability.  The state-created danger claim discussed in this Opinion also is asserted against Defendant Commissioner Clark.

On June 14, 2021, Moving Defendants the City/County of Philadelphia, Commissioner Lisa M. Deely, and Commissioner Al Schmidt filed a Motion to Dismiss for Failure to State a Claim.  (Doc. No. 5.)   On July 6, 2021, Plaintiff filed an Amended Complaint against all Defendants.  (Doc. No. 9.)  In turn, the Court denied Moving Defendants' first Motion to Dismiss without prejudice as moot (Doc. No. 7).

Shortly thereafter, Moving Defendants filed a Second Motion to Dismiss for Failure to State a Claim ("Motion" or "Motion to Dismiss"), which now is before the Court.  (Doc. No 12.)  On August 16, 2021, Plaintiff filed a Response in Opposition ("Response").  (Doc. No. 16.)  And on February 10, 2022, the Court held a hearing on the Motion.  (See Doc. No. 30.)

The Second Motion to Dismiss is now ripe for disposition.  For the reasons stated infra, Moving Defendants' Motion (Doc. No. 12) will be granted.

## II.    BACKGROUND

### A.    Plaintiff Injures Herself at the Polling Center at Ward 66B

Plaintiff Janice Tangradi is a resident of the Commonwealth of Pennsylvania and, during the relevant time, served as an elected committee person in the City of Philadelphia, representing Ward 66B.  (See Doc. No. 9 ¶¶ 1–2.)  In this role, Plaintiff "was responsible [for], among other duties, [] monitoring polling places in her Ward on election day[s]."  (Id. ¶ 3.)

Defendant City/County of Philadelphia ("City") is "charged pursuant to Pennsylvania law with the responsibility of maintaining the Election Board, which oversees voting registration and conducts elections in the City[]."   (Id. ¶ 5.)   The Election Board consists "of three City Commissioners, who are elected every four years by the voters of Philadelphia." (Id. ¶ 6.) During the 2019 election, Defendants Lisa M. Deely ("Commissioner Deely") and Al Schmidt ("Commissioner Schmidt") (collectively, "Commissioner Defendants") served as City

Commissioners.[2]  (Id. at 7.)  As such, they were responsible, pursuant to state law, for "overseeing, training, and controlling the Commission/Election Board employees."  (Id. ¶ 8.)  One employee the Commissioner Defendants were responsible for is identified in the Amended Complaint as Defendant Jane Doe.  (See id.)

On May 21, 2019, Plaintiff was working as a poll watcher at a voting location for Ward 66B in accordance with her duties as an elected committee person.  (See id. ¶ 18.)  One type of voting machine used at Plaintiff's polling center was the Danaher Shouptronic 1242.  (See id. ¶ 19.)  This machine "comes as a unit[] and is designed to fold up for transportation and/or storage." (Id. ¶ 27; see also id., Ex. A.)  "At the rear of the voting machine is an approximately 3 [foot] by 3 [foot] box, approximately 8 [inches] deep, the front of which houses the actual voting machine." (Doc. No. 9 ¶ 28; see also id., Ex. A.)  The machine did not contain any "warnings on the box or anywhere [else] . . . prohibiting persons from stepping inside the box area or warnings of the dangers of stepping inside the box area."  (Doc. No. 9 ¶ 29.)

The City employs technicians "who had been specifically trained to fix the Danaher Shouptronic 1242" should any issues with these voting machines arise during an election.  (Id. ¶ 21.)  Plaintiff, however, never received any "training on the repair and maintenance of the Danaher voting machine" and the City did not provide employees other than the technicians with any "policies/directives/procedures regarding the repair/maintenance of the Danaher voting machine[.]"  (Id. ¶ 23.)

---

2    Commissioner Anthony Clark was the third City Commissioner serving at the time and is also named as a Defendant in this case.  (See Doc. No. 9 ¶¶ 7–9, 22, 53–56.)  However, Clark is no longer a Commissioner and is not represented by counsel for Moving Defendants.  (See Doc. No. 16 at 1.)  As noted, he has not yet been served with a summons and the Amended Complaint, and therefore has not joined in the Motion to Dismiss (Doc. No. 12).

Early in the morning on May 21, 2019, a technician "had been sent to fix a broken voting machine at Plaintiff's polling location[.]"  (Id. ¶ 22.)  And later in the morning, Plaintiff was notified by another poll worker that one of the voting machines was malfunctioning.  (See id. ¶ 19.)  Plaintiff called the office of the City Commissioners to request that a technician be sent to repair the voting machine and made contact with employee Jane Doe.  (See id. ¶¶ 20, 23.)  Instead of dispatching a technician to repair the malfunctioning voting machine, "Jane Doe instructed Plaintiff to attempt to fix the machine herself."  (Id. ¶ 23.)  Specifically, Jane Doe instructed Plaintiff "to check certain things in the front of the machine, push certain buttons, and take certain steps to fix the broken voting machine."  (Id. ¶ 25.)  None of these steps, however, repaired the machine.  (See id. ¶ 26.)

After being informed by Plaintiff that the lights on the voting machine were out, Jane Doe instructed Plaintiff to check the back of the machine to determine whether it was plugged in.  (See id. ¶ 26.)  Plaintiff responded to Jane Doe that the machine was plugged in.  (See id. ¶ 30.)  Next, Jane Doe requested that Plaintiff read her the information that was located on a label on the back of the machine.  (See id.)  Because of the configuration of the voting machine, and because "[t]he print on the label was very small," Plaintiff had to step inside the box in the rear of the machine to be able to read the label.  (Id. ¶ 31.)

To do this, Plaintiff "stepped into the box with her right foot first, and then her left foot, which immediately became stuck in the left corner of the box."  (Id. ¶ 32.)  Plaintiff attempted to dislodge her left foot from the box and, in the process, lost her balance and fell to the ground.  (See id. ¶ 33.)  As a result of the fall, Plaintiff suffered serious injuries, including "a severely broken arm, [which] require[ed] surgery and the insertion of a plate and seven screws, [and] two torn rotator cuffs."  (Id. ¶ 45.)  The Amended Complaint notes that these injuries require ongoing care,

including physical therapy, and lists the medical expenses Plaintiff has incurred as the result of her fall.  (See id. ¶¶ 45–46.)

      **B.**     **This Litigation and Moving Defendants' Motion to Dismiss**

The facts just recited, which are sourced from the Amended Complaint (Doc. No. 9) and are viewed as true for purposes of deciding the Motion to Dismiss, are alleged to support four claims made by Plaintiff in this case.  These claims are as follows: (1) against Defendant Jane Doe, pursuant to 42 U.S.C. § 1983, for subjecting Plaintiff to a state-created danger in violation of Plaintiff's substantive due process rights under the Fourteenth Amendment (Count I); (2) against Defendants the City, Commissioner Deely, Commissioner Schmidt, and Commissioner Clark, pursuant to 42 U.S.C. § 1983, for subjecting Plaintiff to a state-created danger in violation of Plaintiff's substantive due process rights under the Fourteenth Amendment (Count II);[3] (3) strict liability under Pennsylvania law against Defendants Danaher Corporation, Fortive Corporation, Dynapar Corporation d/b/a Danaher Controls, Total Control, Inc., and ABC Corporation (Count III); and (4) negligence under Pennsylvania law against Defendants Danaher Corporation, Fortive Corporation, Dynapar Corporation d/b/a Danaher Controls, Total Control, Inc., and ABC Corporation (Count IV).  (See id. ¶¶ 49–68.)

In their Motion, the City, and Commissioners Deely and Schmidt move to dismiss Count II—the state-created danger claim—pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  Count II is the only Count in which they are named as Defendants.  For

---

[3]    The Amended Complaint refers to Count II as a "42 U.S.C. § 1983-Monell Claim."  (Doc. No. 9 ¶¶ 53–56.)  However, it is clear from the Amended Complaint and the parties' briefing on the Motion to Dismiss that the claim is another state-created danger claim similar to the one against Jane Doe in Count I.  (See id ¶¶ 49–52.)

reasons that follow, the Court will grant Moving Defendants' Motion to Dismiss Count II (Doc. No. 12).

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009).  After Iqbal, it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss.  Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007).  "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'"  Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678).  Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully."  Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (quotation marks omitted) (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago, 629 F.3d 121, set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim."  Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth."  Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

Id. at 130 (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679).  The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to

strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210–11 (3d Cir. 2009) (citing Phillips v. Cty. of Allegheny, 515 F.3d 224, 234–35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV.    ANALYSIS

Defendants the City/County of Philadelphia, and Commissioners Deely and Schmidt move to dismiss Count II of Plaintiff's Amended Complaint. (See Doc. No 12.) In Count II, Plaintiff claims that Moving Defendants are liable under 42 U.S.C. § 1983 ("Section 1983")[4] based primarily on the allegation that Jane Doe, a city employee, subjected Plaintiff to a state-created danger in violation of Plaintiff's substantive due process rights under the Fourteenth Amendment by ordering her to attempt to fix the broken voting machine. (See Doc. No. 9 ¶¶ 53–56.)

---

[4] Section 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other persons within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.

The Court, however, will dismiss Count II against Moving Defendants because: 1) the claims against Commissioner Defendants in their official capacity are the same as the claim against the City; 2) Plaintiff fails to allege a constitutional violation in her claim that Moving Defendants and Jane Doe subjected her to a state-created danger by Jane Doe ordering her to attempt to fix the broken voting machine; and 3) Plaintiff fails to establish that her injury was caused by a municipality policy, custom, or deliberate indifference to the risk of a constitutional violation, as required under <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978).

**A.     Claims Against Commissioner Defendants in Their Official Capacity**

As Moving Defendants point out in their Motion to Dismiss, Plaintiff is suing Commissioners Deely and Schmidt in their official capacity.[5] (<u>See</u> Doc. No. 12 at 6 n.2; <u>see also</u> Doc. No. 9 ¶ 9.) The United States Supreme Court has noted:

> Official-capacity suits . . . generally represent only another way of pleading an action against an entity of which an officer is an agent . . . As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.

<u>Kentucky v. Graham</u>, 473 U.S. 159, 165–66, 114 (1985) (citations and quotations omitted).

Thus, a suit naming both a city and city officials in their official capacity is duplicative since suing the officials in their official capacity is, in effect, the same as suing the city itself. <u>See</u> <u>Hafer v. Melo</u>, 502 U.S. 21, 25 (1991) ("Suits against state officials in their official capacity therefore should be treated as suits against the State.") (citation omitted); <u>Cuvo v. De Biasi</u>, 169 F. App'x 688, 693 (3d Cir. 2006) ("We will affirm the District Court's dismissal of the claims against the officers in their official capacities because a lawsuit against public officers in their official

---

[5]     While Commissioner Clark did not join in the Motion to Dismiss, his involvement in the events that led to Plaintiff's injury is identical to that of Commissioners Deely and Schmidt. Therefore, the following analysis is equally applicable to him.

capacities is functionally a suit against the public entity that employs them.") (citation omitted); Satterfield v. Borough of Schuylkill Haven, 12 F. Supp. 2d 423, 432 (E.D. Pa. 1998) ("By bringing official capacity suits against these three Defendants and against the Borough itself, the Plaintiff has essentially named the Borough as a defendant four times.") (citation omitted).

In such cases, it is within the court's discretion to dismiss the official-capacity claims, though it is not required to do so.  See Satterfield, 12 F. Supp. at 432 (citing Crighton v. Schuylkill Cty., 882 F. Supp. 411, 414–15 (E.D. Pa. 1995).  Here, the Court finds it appropriate to exercise its discretion and dismiss the redundant claims against Commissioners Deely and Schmidt.  The reason for this is, in part, because Plaintiff names the Commissioner Defendants solely by virtue of their positions as City Commissioners and not because of any specific involvement they had in the events that led to Plaintiff's injury.  Plaintiff only alleges that Jane Doe, who was an employee of the Commissioners' Office, "knew or should have known that ordering [] Plaintiff, who had no training, knowledge or experience regarding the repair of voting machines, to fix the broke Danaher voting machine exposed [] Plaintiff to a risk of injury."  (Doc. No. 16 at 8.)

Given this factual scenario, it is unlikely Plaintiff could maintain a claim against Commissioner Defendants even if she sued them in their individual capacity.  See Ewing v. City of Philadelphia, No. 20-3170, 2021 WL 1581186, at *8 (E.D. Pa. Apr. 21, 2021) ("To state a claim against a defendant in his or her individual capacity under Section 1983, a plaintiff must establish that the defendant had personal involvement in committing the alleged violation.") (citation omitted).  Further, it is evident that Plaintiff's claim in Count II is directed towards the City, and not Commissioner Defendants, as Plaintiff identifies it as a "42 U.S.C. § 1983-Monell Claim", a reference to the law necessary to impose liability upon a municipality.  (See Doc. No 9 ¶¶ 53–56.)

Therefore, for all these reasons, the Court will dismiss the claims against Commissioner Defendants Deely and Schmidt.

     **B.**      **State Created Danger Claim**

          **1.**      **Analytical Framework Under <u>Monell</u> and Overview of State-Created Danger Theory of Liability**

Since the only remaining Defendant pursuing the Motion to Dismiss is the City, the question becomes whether the City may be held liable under the framework set forth in <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978). In <u>Monell</u>, the United States Supreme Court held that a municipal entity can be subject to Section 1983 liability in limited circumstances. 436 U.S. at 690. This Court has elaborated on <u>Monell</u> as follows:

> The gravamen of <u>Monell</u> and its progeny is that "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality'—that is, acts which the municipality has officially sanctioned or ordered." <u>Pembaur v. City of Cincinnati</u>, 475 U.S. 469, 480 (1986). In other words, the constitutional deprivation must have its origin in the policy, custom, or deliberate indifference of the municipality, and liability based on the actions of city officials exists only where it can be shown that the officials acted in accordance with that policy, custom, or deliberate indifference. <u>See</u> <u>Monell</u>, 436 U.S. at 694. Moreover, municipalities cannot be held liable under Section 1983 for acts of its employees based on the doctrine of <u>respondeat</u> <u>superior</u> or for other forms of vicarious liability. <u>See</u> <u>id.</u> at 692 (noting that the language of Section 1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor"); <u>see</u> <u>also</u> <u>Reitz v. Cnty. of Bucks</u>, 125 F.3d 139, 146 (3d Cir. 1997) ("[M]unicipal liability simply cannot be predicated upon a showing of respondeat superior.").

<u>Ewing</u>, 2021 WL 1581186, at *6.

Therefore, to state a claim against a municipality under Section 1983, a plaintiff must plausibly allege the existence of two elements: (1) a constitutionally protected right has been violated, and (2) the alleged violation resulted from a municipal policy, custom, or deliberate indifference. <u>See</u> <u>Monell</u>, 436 U.S. at 694–95; <u>Andrews v. City of Philadelphia</u>, 895 F.2d 1469,

1480 (3d Cir. 1990). The Court will begin with the first prong of the analysis: whether Plaintiff has established that the City violated a constitutionally protected right.

Plaintiff alleges that she was subjected to a state-created danger when Jane Doe ordered her to fix the broken voting machine and that this danger caused her injury in violation of her substantive due process rights guaranteed under the Due Process Clause of the Fourteenth Amendment.[6] (See Doc. No. 9 ¶¶ 49–56.) To sustain a claim under the state-created danger theory of liability, Plaintiff must show that: (1) "she suffered a 'foreseeable and fairly direct' harm"; (2) "the state acted with a degree of culpability that shocks the conscience'"; (3) "she 'was a foreseeable victim . . . or a member of a discrete class of persons' potentially harmed 'by the state's actions'"; and (4) "the state 'affirmatively used [its] authority' to 'create[] a danger' or make her 'more vulnerable to danger than had [it] not acted at all.'"[7] Mears v. Connolly, 24 F.4th 880 (3d

---

[6]    In their Motion, Moving Defendants cite Collins v. City of Harker Heights, Tex., in arguing that Plaintiff's claim "is the type of 'fairly typical state-law tort claim' that the Due Process Clause was not designed to supplant." (Doc. No. 12 at 7 (citing Collins v. City of Harker Heights, Tex., 503 U.S. 115, 128 (1992).) While the Court may agree with the sentiment that this case is better-suited to be charged as a state-law tort claim, rather than a claim arising under the Due Process Clause of the United States Constitution, Plaintiff is correct in arguing that Collins is distinguishable. Here, it is clear that Plaintiff is asserting a state-created danger claim against Jane Doe, which is a recognizable claim in this Circuit, and not a "general allegation that the [C]ity deprived [her] of life and liberty by failing to provide a reasonably safe work environment", as was the case in Collins. 503 U.S. at 125–26.

[7]    The state-created danger theory has its origins in DeShaney v. Winnebago Cty. Dep't of Soc. Servs., a United States Supreme Court decision in which the Court held that Fourteenth Amendment does not impose a duty on the State to protect a child from his father when it had received complaints that the father was abusing the child. 489 U.S. 189 (1989). Or, to frame the holding more broadly, the Court "[a]s a general matter . . . conclude[d] that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." Id. at 197.

The Court reasoned that nowhere in the language of the Due Process Clause does it "confer [an] affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." Id. at 196. Further, the Court noted that, in instances where the Due Process Clause had been held to impose an affirmative duty upon the State to provide individuals with protection, there existed "'special relationships' created or assumed by the State with respect

to [the] particular individuals," which arise "from the limitations which it has imposed on his freedom to act on his own behalf, through imprisonment, institutionalization, or other similar restraint of personal liberty." Id. at 189–90.

In dicta in Deshaney, the Court noted: "While the State may have been aware of the dangers that Joshua faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." Id. at 201. Recently, in Johnson v. City of Philadelphia, the Third Circuit succinctly described how these words led to a marked alteration in the jurisprudence of this Circuit:

> From those simple words—"played no part in their creation" and "render him any more vulnerable"—sprang a considerable expansion of the law. While seemingly not part of DeShaney's holding, lower courts seized on those words to create a new remedy that would, it was thought, aid the next "[p]oor Joshua." Thus was born the "state-created danger" theory of liability, which we adopted in Kneipp v. Tedder, 95 F.3d 1199, 1205 (3d Cir. 1996). There, a severely intoxicated husband and wife were walking home from a bar. Id. at 1201. Police officers stopped the couple, separated them, and allowed the man to continue on his way. Id. at 1201–02. The officers later "sent [the woman] home alone," but she never made it; she was "found unconscious at the bottom of an embankment" the next day. Id. at 1202–03. The woman's parents then sued, asserting that the officers had violated their daughter's substantive due process rights. Id. at 1203. But there was no "special relationship" between the state and the decedent falling within DeShaney's narrow holding. Id. at 1205.
>
> Charting a new course, we elevated the commentary in DeShaney and discovered that the Court had "left open the possibility that a constitutional violation might . . . occur[]" when a state "play[s a] part in . . . creat[ing]" a danger or when it "render[s a person] more vulnerable to" that danger. Id. at 1205 (quoting DeShaney, 489 U.S. at 201, 109 S.Ct. 998). Since the police separated the couple, "then sen[t the woman] home unescorted in a seriously intoxicated state in cold weather," the state, through its actors, "made [her] more vulnerable to harm." Id. at 1209. The danger, we explained, was not the plaintiff's intoxicated journey from tavern to domicile. Id. Rather, it was the "state-created danger" of removing her male companion, who presumably would have sheltered her from peril, that violated the guarantee of due process framed in the Fourteenth Amendment. Id. at 1211.

975 F.3d 394, 398–99 (3d Cir. 2020) (footnotes omitted) (alterations in original).

The Johnson court also noted the criticism the doctrine has faced since becoming more widespread among the federal courts, observing that, while other Circuits have recognized the state-created danger doctrine, "the Supreme Court has not." Id. at 399–400. The Johnson court continued:

> [The state-created danger doctrine] does not stem from the text of the Constitution or any other positive law, and consequently vests open-ended lawmaking power in the judiciary. Moreover, the "state-created danger" doctrine offers little help to public employees seeking to better discharge their

Cir. 2022) (citing <u>Bright v. Westmoreland Cty.</u>, 443 F.3d 276, 281 (3d Cir. 2006)) (alterations in original).  The parties only dispute whether Plaintiff has made an adequate showing as to the first, second, and fourth elements of this test.  (<u>See</u> Doc. No. 12 at 8; Doc. No. 16 at 8.)  For reasons that follow, because Plaintiff has failed to demonstrate the first and second elements, she cannot sustain a claim under the state-created danger doctrine.

---

duties, and does not tell them "what to do, or avoid, in any situation." <u>Weiland v. Loomis</u>, 938 F.3d 917, 919 (7th Cir. 2019).

<u>Id.</u> at 400 (footnote omitted).

Like the majority in <u>Johnson</u>, this Court similarly "remain[s] bound to faithfully apply our precedent explaining the scope of the doctrine" and does so in the instant action.  <u>Id.</u>  However, the Court would be remiss if it did not also take the opportunity to echo the concerns that the court in <u>Johnson</u> raised over the validity and efficacy of applying this doctrine.  In his concurrence in <u>Johnson</u>, Judge Matey expressed concern that "the doctrine exemplifies a 'troubling' expansion of substantive due process." <u>Id.</u> at 404–05 (Matey, J., concurring) (citing <u>Kedra v. Schroeter</u>, 876 F.3d 424, 462 (3d Cir. 2017) (Fisher, J., concurring)).  In a separate concurrence, Judge Porter wrote to "explain [his] view that [the] full [Third Circuit Court of Appeals] should revisit the state-created danger doctrine" completely or, at the very least, "should nevertheless revisit our test" for applying the doctrine.  <u>Id.</u> at 405 (Porter, J., concurring).

The Court here also believes that it may be appropriate for the Third Circuit to reconsider the viability of the doctrine or how it is currently in this Circuit.  As the <u>Johnson</u> court noted, the doctrine "does not stem from the text of the Constitution[,]" <u>id.</u> at 400, and, "'the place to make new legislation . . . lies in Congress[,]'" <u>id.</u> (Matey, J., concurring) (bracket omitted) (quoting <u>Bostock v. Clayton Cty., Georgia</u>, 140 S.Ct. 1731, 1753 (2020)).  This lack of a constitutional foundation, the lack of guidance to public employees regarding how to shape their behavior, and the apparent difficulty in applying the current test under a substantive law analysis all demonstrate that the state-created danger doctrine should be reconsidered or revamped.  Other drawbacks are when, under certain circumstances, a tort under state law committed by a public employee is converted into a state-created danger theory to artificially increase the potential liability, or is asserted to allow the case to proceed in federal court where jurisdiction otherwise would not exist.

Notwithstanding any of the above, the Court will apply the doctrine as it is currently formulated to the dispute at hand.

### 2.      Foreseeable and Fairly Direct Harm

Under the first element, which has two prongs—foreseeability and fairly direct harm—Plaintiff must first show that the harm she suffered was foreseeable and a fairly direct result of Jane Doe's actions.  Insofar as foreseeability is concerned, Moving Defendants argue that "Plaintiff cannot plausibly suggest that Jane Doe was aware of the risk of Plaintiff breaking her arm" and that "[i]t is the <u>harm</u> ultimately caused that must be foreseeable."  (Doc. No. 12 at 10 (citing <u>Quinn v. Badolato</u>, No. 16-0591, 2016 WL 4107701, *5 (E.D. Pa. July 29, 2016), <u>aff'd</u>, 709 F. App'x 126 (3d Cir. 2017)) (alteration and emphasis in original).)

Plaintiff responds that "the risk of harm in this case was Jane Doe ordering [] Plaintiff to fix the machine without any training or experience."  (Doc. No. 16 at 10.)  According to Plaintiff, Jane Doe did not have to be "aware of the specific harm" that would befall Plaintiff since "ordinary common sense and experience" should have put Jane Doe on notice that ordering Plaintiff to fix the machine without training or experience exposed her to a risk of harm.  (<u>Id.</u> at 9 (citing <u>L.R. v. Sch. Dist. of Philadelphia</u>, 836 F.3d 235, 245 (3d Cir. 2016)).)

Plaintiff's argument regarding the foreseeability of her injury is unpersuasive.  "To show that her injuries were foreseeable, [Plaintiff] must allege that [Jane Doe] had 'actual knowledge or an awareness of risk that [was] sufficiently concrete to put [her] on notice of the harm.'"  <u>Mears</u>, 24 F.4th at 884 (citing <u>Phillips</u>, 515 F.3d at 238) (last two alterations in original).  But, regardless of whether the Court accepts Plaintiff's position that Jane Doe only needed to be aware of the risk of harm generally in ordering Plaintiff to attempt to fix the machine, or Defendants' position that it was the specific risk that Plaintiff would break her arm that must have been foreseeable, the result here is the same.  It is not foreseeable that asking someone to attempt to fix a malfunctioning voting machine, by "check[ing] certain things in front of [the] machine, push[ing] certain buttons,"

checking "the back of the voting machine [to] make sure it was plugged in," or reading "a label that was located on the rear of the voting machine," as is alleged here, would subject that person to a risk of harm so obvious that it would be fair to impute upon Jane Doe "actual knowledge or awareness of [the] risk" of harm.  (Doc. No. 9 ¶¶ 25, 26, 30); Mears, 24 F.4th at 884 (citing Phillips, 515 F.3d at 238).  Even when the facts alleged in the Amended Complaint are viewed in the light most favorable to Plaintiff, they are not sufficient to put Jane Doe on notice that she subjected Plaintiff to a risk of harm, never mind the risk that she would fall and break her arm.  This result is also irrespective of the lack of any technical training or knowledge by Plaintiff of which Jane Doe may or may not have been aware.

The outcome here is unlike the one in the Third Circuit's recent decision in Mears, where in reversing the dismissal of a state-created danger claim, the court held that the foreseeability requirement was satisfied.  24 F.4th 880.  There, a psychiatrist at a state-run psychiatric hospital encouraged the plaintiff to visit her son, who was institutionalized at the facility.  See id. at 883. The hospital had a policy that its staff was to supervise all patient meetings.  See id.  However, nobody was assigned to supervise the plaintiff's meeting with her son.  See id.  A nurse at the institution, who was aware of this policy and the oversight regarding the plaintiff's visit, accompanied the plaintiff in the room with her son but left mid-visit.  See id.  After the nurse left, the plaintiff's son beat her severely, inflicting serious injury.  See id.

Thereafter, the plaintiff brought a Section 1983 claim against, among other defendants, the psychiatrist and the nurse, under a state-created danger theory.  See id.  In holding that the district court erred when it found that the harm committed was not foreseeable, the court stated:

> Nurse Oglesby was the head of Brenden's nursing team.  While under her care, his mental health had "deteriorated significantly," and he had "bec[o]me progressively more psychotic."  Just three days before [the plaintiff]'s visit, he was "acting bizarrely" and attacked another patient.  These facts would have put her on notice

of the serious threat Brenden posed to his mother.   Indeed, she repeatedly complained to [the plaintiff] about Brenden's behavior.

Id. at 884–85.

The facts of this case are also unlike those in the Third Circuit's seminal case concerning the state-created danger theory of liability, Kneipp v. Tedder, 95 F.3d 1199 (3d Cir. 1996).  There, police officers separated a discernibly intoxicated woman from her husband during their walk home from a tavern late on a January night.  Kneipp, 95 F.3d at 1202.  The officers sent the woman, who was "[u]nable to stand by herself," to walk the rest of the way to the couple's apartment on her own.  Id. at 1201.  The woman never made it back to the apartment and, due to anoxia caused by hypothermia from the cold, she suffered permanent brain damage.  See id. at 1203.  The woman's legal guardians brought suit against the City of Philadelphia and several police officers. See id.

In reversing the District Court's grant of summary judgment in favor of the defendants, the Third Circuit outlined what would become the framework for the state-created danger theory of liability.   The Court held that, because of the severity and apparentness of the woman's intoxication, "a reasonable jury could find that the harm likely to befall Samantha if separated from Joseph while in a highly intoxicated state in cold weather was indeed foreseeable."  Id. at 1208; see also Phillips, 515 F.3d at 237 (subsequent Third Circuit decision attributing this finding of foreseeability in Kneipp to the officer's "ordinary common sense and experience").

Similarly, in L.R., a kindergarten teacher released one of his students to an adult who had neither identification nor verification that the student had permission to leave school.  836 F.3d at 239–40.  The adult later sexually assaulted the student off school premises.  Id. at 240.  The child's parent brought suit against the teacher, among other defendants, under a state-created danger theory.  Id.  The court found that "it was foreseeable that releasing a young child to a stranger could

result in harm to the child." Id. at 245.  According to the court, "[t]his inherent risk is not only a matter of experience as a teacher in charge of a kindergarten classroom, but, as in Kneipp, it is also a matter of common sense." Id.

The same cannot be said here.  The Amended Complaint does not allege any facts like those in Mears, Kneipp, or L.R. that would have put Jane Doe on notice of a "serious threat . . . posed to" Plaintiff by requesting that she fix the voting machine.  Mears, 24 F.4th at 885.  There are no allegations of past instances where anyone, regardless of whether they had received specialized training on how to fix the voting machines, had suffered an injury, serious or otherwise, by attempting to fix a voting machine.  Nothing in the Amended Complaint even suggests that anyone had previously complained to Jane Doe regarding a risk of harm caused by the voting machines or that anything had previously occurred that would make her aware of the risk of harm.  Further, Plaintiff's assertion that the risk of harm of asking a person to investigate a malfunctioning voting machine—by checking if it is plugged in or reading a label on the back of the machine, as is alleged here—is so obvious and inherent that "common sense and experience" should have put Jane Doe on notice of the risk is unpersuasive.  And the fact that there are trained technicians who can fix the machines does not mean that they are inherently dangerous.  Thus, Plaintiff has not demonstrated that the harm she suffered was foreseeable.

Plaintiff has a stronger claim, however, that the harm she suffered was "fairly direct," the second prong of the first element.  Under the facts here, Jane Doe may be considered as "the catalyst" for the chain of events that ultimately led to Plaintiff's injury, insofar as her instructions to Plaintiff put the chain of events in motion.  Id. (citation and quotations omitted).  In this regard, Plaintiff was an "identifiable and discrete" individual and "not a random passerby." Id. (citation and quotations omitted).  While Moving Defendants argue that the harm Plaintiff suffered "is too

attenuated from Jane Doe's alleged actions" and that "there were several intervening causes that occurred between Jane Doe's actions and Plaintiff's ultimate harm[,]" this argument is without merit given the allegations in the Amended Complaint.  (Doc. No. 12 at 9–10 (citing Henry v. City of Erie, 728 F.3d 275, 283 (3d Cir. 2013)) (alteration in original).) [8]  Therefore, Plaintiff has sufficiently alleged that the harm she suffered was fairly direct from Jane Doe's actions because these actions did set in motion a chain of events that apparently resulted in Plaintiff's injury.

However, "[s]tate actors are not liable every time their actions set into motion a chain of events that result in harm."  Henry, 728 F.3d at 283.  This is especially true when the harm is not foreseeable.  Accordingly, even though Plaintiff can satisfy the "fairly direct" prong, she still fails to establish the first element of a state-created danger claim because this element requires that the harm must be both foreseeable and fairly direct.

### 3.    Shocks the Conscience

The next factor in dispute is the third element of the state-created danger test:  whether Jane Doe's actions shocks the conscience.  Moving Defendants simply argue that Jane Doe's behavior "sounds perfectly logical in that she asked Plaintiff to read a label on the machine in an attempt to ascertain why it was not working."  (Doc. No. 12 at 11.)  Plaintiff argues to the contrary that, in doing so, Jane Doe consciously disregarded a substantial risk of serious harm.  (Doc. No. 16 at 14.)  Regarding the application of this element, the Third Circuit has noted:

> We have identified three potential levels of culpability.  In "hyperpressurized environment[s] requiring a snap judgment," an official must actually intend to cause harm in order to be liable.  In situations in which the state actor is required to act "in a matter of hours or minutes," we require that the state actor "disregard a great risk of serious harm."  And where the actor has time to make an "unhurried

---

[8]    Moving Defendants' main argument is that Plaintiff's decision to step into the box in the back of the machine was an intervening cause in the chain of events.  (See Doc. No. 12 at 10.) However, Jane Doe began the chain of events and, given the sequence of events here, it would be a stretch to disagree with Defendants' argument.

judgment[]," a plaintiff need only allege facts supporting an inference that the official acted with a mental state of "deliberate indifference."

Kedra, 876 F.3d at 437 (citations omitted) (alterations in original)

Here, Plaintiff argues that "deliberate indifference" is the appropriate standard by which to analyze Jane Doe's actions.  (Doc. No. 16 at 14.)  Deliberate indifference has been described as a "conscious disregard of a substantial risk of serious harm . . . or willful disregard demonstrated by actions that evince a willingness to ignore a foreseeable danger or risk[.]"[9] Kedra, 876 F.3d at 437 (quotations and citations omitted).

Viewing the allegations in the Amended Complaint in the light most favorable to Plaintiff, neither of these two definitions characterize Jane Doe's actions.  As discussed above, it was not foreseeable to Jane Doe that in asking Plaintiff to attempt to fix the machine, Jane Doe subjected her to any risk of harm.  See also Lesher v. Zimmerman, No. 04731, 2019 WL 1110114, at *4 (E.D. Pa. Mar. 11, 2019), aff'd, 822 F. App'x 116 (3d Cir. 2020) ("the mere possibility that an injury may result from an activity does not mean that there is a 'substantial risk' of that injury occurring") (citation omitted).  Thus, it can hardly be argued that Jane Doe consciously or willfully disregarded a substantial risk of serious harm through her actions.

In arguing to the contrary, Plaintiff relies on the fact that "Jane Doe knew that the City had trained technicians to fix the voting machines," which she characterizes as "highly complex, electronic machines", and that "common sense" should have led her to realize that she was

---

[9]   As part of his concurrence in Johnson v. City of Philadelphia, Judge Porter specifically noted the difficulty district courts encounter when applying this element of the state-created danger doctrine.  He "suggest[s] combining the second and third tiers [of the shock the conscience inquiry] into one [to] make the inquiry more straightforward[.]"  975 F.3d 394, 406 (3d Cir. 2020) (Porter, J., concurring).  He posits that "there is no practical difference between a 'disregard of a great risk of serious harm' (the second tier) and a 'conscious disregard of a substantial risk of serious harm' (the third tier)."  Id.

subjecting Plaintiff to a substantial risk of harm.  This argument, however, is unconvincing.  (Doc. No. 16 at 10.)  While Plaintiff may not have possessed specialized knowledge about fixing the machines, there is no allegation that they are the kind of machine that have a penchant for injuring people.  A forklift, bulldozer, or chainsaw, for example, would fall into this latter category.  And, as noted earlier, nothing in the Amended Complaint plausibly suggests that a substantial risk of harm arose from attempting to fix the machine, or that Jane Doe consciously or willfully ignored such a harm in requesting Plaintiff to take the actions that she did.  The Amended Complaint also does not allege sufficient facts to show that the existence of any risk of harm was "obvious."  (Doc. No. 16 at 14); Compare Kedra, 876 F.3d at 443–44 ("conscious disregard of a substantial risk of a serious harm" inferred due to "the obviousness of the risk of pointing a gun at a defenseless person and pulling the trigger without undertaking any safety check whatsoever"); L.R., 836 F.3d at 246 ("the risk of harm in releasing a five-year-old child to an unidentified, unverified adult is 'so obvious' as to rise to the level of deliberate indifference").

Instead, as Moving Defendants argue, "Jane Doe's behavior sounds perfectly logical." (Doc. No. 12 at 11.)  She simply asked Plaintiff to look at the machine and see if she could determine what was causing the malfunction.  At the very least, Jane Doe's behavior by no means "shocks the conscience," even when viewing the allegations in the Amended Complaint in the light most favorable to Plaintiff.  For these reasons, Plaintiff has failed to establish the second element of the state-created danger test.

### 4.    Affirmative Act

The final element of the state-created danger test "asks whether the state's conduct created or increased the risk of danger to the plaintiff." L.R., 836 F.3d at 242.  The element requires an

affirmative act because "it is the misuse of state authority, rather than a failure to use it, that can violate the Due Process Clause." Id. (citing Bright, 443 F.3d at 282) (bracket omitted).

The test courts have formulated in analyzing this element is as follows: "(1) a state actor exercised his or her authority, (2) the state actor took an affirmative action, and (3) this act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all." Ye v. United States, 484 F.3d 634, 639 (3d Cir. 2007) (citing Bright, 443 F.3d at 281–82). Courts have noted the problem in applying this test due to the "inherent difficulty in drawing a line between an affirmative act and a failure to act" and because "virtually any action may be characterized as a failure to take some alternative action." L.R., 836 F.3d at 242 (footnotes omitted). In response to this difficulty, the Third Circuit has elaborated that:

> Rather than approach this inquiry as a choice between an act and an omission, we find it useful to first evaluate the setting or the "status quo" of the environment before the alleged act or omission occurred, and then to ask whether the state actor's exercise of authority resulted in a departure from that status quo. This approach, which is not a new rule or concept but rather a way to think about how to determine whether this element has been satisfied, helps to clarify whether the state actor's conduct "created a danger" or "rendered the citizen more vulnerable to danger than had the state not acted at all."

L.R., 836 F.3d at 432 (footnote and citation omitted).

This manner of thinking regarding the final element is also sometimes expressed as a "but-for" test. See Ye, 484 F.3d at 642 ("We have often adopted the language of 'but for' causation when describing this last requirement of state-created danger liability.") (citation omitted).

In their Motion, Moving Defendants argue that "[t]he alleged action by Jane Doe and Plaintiff's harm are far too attenuated" and that the Amended Complaint merely alleges that her actions "'increased the risk of harm' to [] [P]laintff", instead of showing a "direct causal relationship." (Doc. No. 12 at 12 (citing Grau v. New Kensington Arnold Sch. Dist., 429 F. App'x 169, 173 (3d Cir. 2011); Kaucher v. Cty. of Bucks, 455 F.3d 418, 432 (3d Cir. 2006)).) In Plaintiff's

Response, she argues that the direct causal relationship is demonstrated when viewing the situation under the "status quo" or "but-for" tests.  (See Doc. No. 16 at 16–17.)

Here, the status quo prior to Plaintiff's call to Jane Doe was that Plaintiff was not standing in the box in the back of the machine in an attempt to read the label.  In other words, but for Jane Doe requesting Plaintiff to attempt to fix the voting machine, it is likely that Plaintiff would never have stepped into the box in the back of the machine to read the label, had her foot stuck, attempted to dislodge it, lost her balance, and broken her arm.  Therefore, when viewing the facts in the light most favorable to Plaintiff, it can fairly be said that Jane Doe's affirmative actions formed a direct causal relationship with Plaintiff's injury, in that, if it were not for Jane Doe's actions, the harm would not have occurred.

Therefore, Plaintiff has satisfied the final element of the state-created danger test. However, because she has failed to demonstrate that the harm she suffered was foreseeable, or that Jane Doe's actions shocks the conscience, her state-created danger claim ultimately fails.

### C.      Policy, Custom, or Deliberate Indifference – <u>Monell</u>'s Second Prong

Plaintiff's Section 1983 claim against the City also fails because she has not established the second prong under <u>Monell</u>: that the alleged constitutional violation resulted from a municipal policy, custom, or deliberate indifference.  See <u>Monell</u>, 436 U.S. at 694–95.

#### 1.      Policy or Custom

To demonstrate a municipal policy, a plaintiff must cite to an official policy.  See <u>id.</u> at 690 (holding a municipality may be sued under Section 1983 when it "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."); See also <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 263 (3d Cir. 2010) ("'Policy' includes official proclamations made by municipal decision makers with final authority . . . ").

Custom "is defined as practices of state officials . . . so permanent and well settled as to virtually constitute law." Kelly, 622 F.3d at 263 (citing Berg v. Cty. of Allegheny, 219 F.3d 261, 275 (3d Cir. 2000)).  Examples of a municipal custom include a specific reference to multiple incidents of constitutional violations or statistical analysis of lawsuits against a municipality.  See Harris v. City of Philadelphia, 171 F. Supp. 3d 395, 401–02 (E.D. Pa. 2016) (finding a custom where there were "multiple incidents" of police officers using reckless and excessive force in their use of batons); Simpson v. Ferry, 202 F. Supp. 3d 444, 452 (E.D. Pa. 2016) (permitting a Monell claim to proceed following a review of the plaintiff's statistical analysis about the number of lawsuits against the Philadelphia Police Department for use of excessive force).

Regarding policy and custom, the City argues that Plaintiff "simply parrots the legal standard for municipal liability without pleading any facts." (Doc. No. 12 at 14.)  The City is correct.  To survive a motion to dismiss, the Amended Complaint must have included "specific factual allegations referencing the conduct, time, place, and persons responsible for any official municipal policy or custom" that was the cause for the City's alleged violation of a constitutionally protected right.  Torres v. City of Allentown, No. 07-1934, 2008 WL 2600314, at *5 (E.D. Pa. June 30, 2008) (citing Evancho v. Fisher, 423 F.3d 347, 353 (3d Cir. 2005)).  Further, "merely including 'the phraseology that a municipality's policy or custom violated [P]laintiff's constitutional rights, when unadorned with supporting facts" is insufficient to survive a motion pursuant to Federal Rule of Civil Procedure 12(b)(6).  Saleem v. Sch. Dist. of Philadelphia, No. 12-3193, 2013 WL 5763206, at *3 (E.D. Pa. Oct. 24, 2013) (citing O'Hara v. Cty. of Allegheny, No. 12-818, 2013 WL 501374, at *4 (W.D. Pa. Feb. 8, 2013)) (original alterations omitted); see also Wood v. Williams, 568 F. App'x 100, 104 (3d Cir. 2014) ("conclusory and general claims" at the pleading stage are insufficient under Monell).

Here, Plaintiff merely argues the City "condoned and/or acquiesced in the unconstitutional practice/custom of its employees . . . regarding ordering untrained/unqualified poll workers to fix broken voting machines."  (Doc. No. 9 ¶ 54.)  The only fact Plaintiff cites in support of this proposition is that, "despite having trained technicians, [] Plaintiff, a poll watcher who was neither trained nor experienced in fixing voting machines, was ordered to do so[.]"  (Doc. No. 16 at 19.) She cites no specific City policy or widespread custom that led to the alleged constitutional violation.  As such, "[P]laintiff's claims amount to a mere recitation of the required elements to bring forth a <u>Monell</u> claim and are insufficient to survive a motion to dismiss" on the policy or custom prongs.  <u>Butler v. City of Philadelphia</u>, No. 11-7891, 2013 WL 5842709, at *2 (E.D. Pa. Oct. 31, 2013).

### 2.      Deliberate Indifference

Plaintiff also claims that the City can be held liable under <u>Monell</u> because it "failed to have any policies related to the fixing of voting machines, and the fixing of voting machines by persons not qualified to do so, or the training of persons who might be responsible for fixing voting machines when the need for such policies was obvious[.]"  (Doc. No. 9 ¶ 55.)  Plaintiff is arguing here that the City was deliberately indifferent to the need for these policies or training, and that such deliberate indifference led to her injury.

Moving Defendants argue to the contrary that the claim that the City did not have policies or training relating to the fixing of voting machines is contradictory to Plaintiff's first claim that the City had a policy of requiring untrained poll workers to fix them.  (<u>See</u> Doc. No. 12 at 15.) They also argue that "Plaintiff fails to plead any facts that would suggest a pattern of unconstitutional conduct by untrained employees" and that Plaintiff admits that the City "did indeed have" trained personnel to fix the machines.  (<u>Id.</u> at 16.)

That a municipality acted with deliberate indifference to the need to train employees is proper basis to establish liability under Monell:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983.  A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.  To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the untrained employees come into contact.  Only then can such a shortcoming be properly thought of as a city policy or custom that is actionable under § 1983.

Connick v. Thompson, 563 U.S. 51, 61 (2011) (citations, quotations, and brackets omitted).  "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train."  Id. at 62 (quoting Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 409 (1997)).

The test the Third Circuit has formulated to analyze failure-to-train cases is as follows:

> A plaintiff sufficiently pleads deliberate indifference by showing that "(1) municipal policymakers know that employees will confront a particular situation[,] (2) the situation involves a difficult choice or a history of employees mishandling[,] and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights."

Estate of Roman v. City of Newark, 914 F.3d 789, 798 (3d Cir. 2019) (alterations in original) (quoting Doe v. Luzerne Cty., 660 F.3d 169, 180 (3d Cir. 2011)).

The Amended Complaint offers no facts whatsoever to satisfy any of these factors.  Plaintiff only alleges that "[t]he fact that Defendant Jane Doe ordered Plaintiff to fix the broken voting machine, instead of relying upon the trained technicians, supports the conclusion that the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that Defendants['] failure to train Defendant Jane Doe regarding who can fix voting machines" is enough to support her claim.  (Doc. No. 16 at 21 (quotations omitted).)  Similar

to her claims that a City policy or custom led to her injury, the allegations underlying Plaintiff's failure-to-train theory are too "conclusory and general" to survive a motion to dismiss. Wood, 568 F. App'x at 104. And, as outlined in the analysis above, the Court finds unpersuasive Plaintiff's argument that the likelihood of a constitutional violation in this scenario was "obvious" or "sufficiently foreseeable." (Doc. No. 16 at 20.) For this reason, the first element of the Third Circuit test is not met: the municipal policymaker knew that the employee will confront a particular situation. Moreover, the allegations about fixing the machine do not show that Plaintiff had a difficult choice, and there is no allegation of a history of employees mishandling similar situations. Thus, the second element has been insufficiently shown in the Amended Complaint. For these reasons alone, deliberate indifference has not been sufficiently alleged, even when viewing the facts in the Amended Complaint in the light most favorable to Plaintiff.[10]

Therefore, because Plaintiff cannot show that a City policy, custom, or deliberate indifference caused a constitutional violation, she cannot satisfy the second prong of Monell.

## V.     CONCLUSION

For all the foregoing reasons, Moving Defendant's Motion to Dismiss Count II of the Amended Complaint against Defendants the City, Commissioner Deely, and Commissioner Schmidt (Doc. No. 12) will be granted. They are dismissed as Defendants in this case. An appropriate Order follows.

---

[10]   Because the first two elements of the Third Circuit failure-to-train test are not met, there is no need to discuss the third element.